FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2012 MAR 26 PM 4: 15

CLERK_____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 111-365 |
| | ) | |
| JULIAN KENNETH HARDIN | ) | |

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

In the above-captioned criminal case, the government has accused Defendant Julian

Kenneth Hardin ("Hardin") of one count of manufacture of marijuana, in violation of 21

U.S.C. §§ 841(a)(1) and (b)(1); one count of possession of a firearm in furtherance of a drug

trafficking crime, in violation of 18 U.S.C. § 924(c); and one count of being a prohibited

person in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(3) and

924. Hardin has moved to suppress all statements made and physical evidence or information

seized as a result of the searches of his person and property on September 21, 2011. (Doc.

no. 37). The Court held an evidentiary hearing on the matter, at which time the Court heard

testimony from Special Agent Michael Marbert ("SA Marbert") with the United State Drug

Enforcement Administration. Now, for the reasons developed more fully herein, the Court

**REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.

## I.     FACTS

On September 19, 2011, SA Marbert applied for a search warrant to search Hardin's

residence and property, located at 3979 Lexington Highway, Washington, Georgia, as well as

all outbuildings located on the curtilage of Defendant's residence and any vehicles located at

the residence or on the premises. (Doc. no. 37, Ex. A, p. 3 (*hereinafter* "Application for Search Warrant").) According to Hardin, this warrant was secured only after law enforcement officials conducted an illegal search of his property on August 29, 2011. (Doc. no. 37, p. 2.) Hardin did not submit an affidavit or testify on behalf of his motion, but he instead relied on the Affidavit that SA Marbert submitted in support of the Application for Search Warrant. (Id., Ex. A, pp. 6-10.)

The government does not contest, and SA Marbert's testimony at the evidentiary hearing confirms, the sequence of events leading up to the issuance of the search warrant. According to SA Marbert, at some time prior to July 21, 2011, Wilkes County Investigator Jimmy Harrison received information from an unspecified source that Hardin was growing marijuana in and around his residence. (Id. at 8.) On July 21, 2011, SA Marbert and "RAC Elliott Strother" also received information from a source of information ("SOI") who had visited Hardin's house several times over a course of months and had observed a number of marijuana plants and firearms at Hardin's residence. (Id.) Furthermore, the Affidavit provided that the SOI had proved to be a reliable source of information about other drug traffickers in the McDuffie County and Wilkes County areas and had provided reliable information in at least two other cases in the past, one of which had resulted in a conviction and one of which was ongoing. (Id.)

The following narrative was included in SA Marbert's Affidavit and Application for Search Warrant and was confirmed by his testimony at the evidentiary hearing:

> HARDIN's residence is located on about 311 acres of land. The residence has a long driveway secured by a gate at Lexington Highway. The residence is not clearly visible from the highway and does not have any close neighbors. On August 29, 2011, S/A Marbert and Investigator Harrison performed surveillance at 3979 Lexington Highway, Washington, Georgia.

S/A Marbert and Inv. Harrison entered the approximately 311 acre property, and observed the residence from off the curtilage with field glasses. A subject matching HARDIN's description was behind the house walking between an out building and the residence. At least one kush type[1] marijuana plant was in view through the vegetation and tall grass. A small shooting range with a rifle target was also observed off the curtilage.

(Id. at 8-9.) Finally, the Affidavit also included details of Hardin's criminal history of marijuana-related charges. (Id. at 8.)

At the evidentiary hearing, SA Marbert clarified that he and Investigator Harrison parked on a dirt road about a mile behind Hardin's property, traveled across a hayfield and through a wooded area until they reached another field, where they conducted their surveillance from the edge of the woods. (FTR 2:08:13-08:53.[2]) SA Marbert reported that the property included several old barbed-wire livestock fences – most of which were down – that he and Investigator Harrison stepped over to reach the location where they conducted their surveillance. (FTR 2:16:54-17:04.) According to SA Marbert, the distance from their location at the edge of the woods to Hardin's residence was approximately 100 yards; he and Investigator Harrison never ventured closer to the residence than from this point. (FTR 2:10:50-11:20; 2:16:25-16:38.) SA Marbert further reported that there was no interior fence surrounding the residence; the closest fence to the residence was an old livestock fence that had fallen down about 100 yards from the home. (FTR 2:16:38-17:38.)

From their vantage point at the edge of the woods, SA Marbert stated that although there were "some bushes, trees, and tall grass" between where they were standing and the

---

[1]According to the Affidavit, "kush" is a high grade marijuana that brings a price between $4,000.00 and $6,000.00 per pound. (Doc. no. 37, Ex. A, p. 7.)

[2]Although a transcript of the March 12, 2012 hearing has not been prepared, the Court was able to review the proceedings on the Court's recording system, For the Record ("FTR").

residence, he and Investigator Harrison were able to make unobstructed observations of a person matching Hardin's description walking near the residence and an outbuilding, as well as a large marijuana plant growing in an unmown area nearby. (FTR 2:11:44-13:02.) He further stated that he used field glasses to make his observations. (Id.) According to SA Marbert, the area between the marijuana plant and where the officers were standing was overgrown with grass and bushes, although there was a mown area closer to the residence. (FTR 2:11:56-12:17; 2:14:11-14:56.) Further, SA Marbert reported that the only sign of use near where the officers were standing was a "backstop" (or target) for a rifle, which was set up as part of a small shooting range; SA Marbert stated that seeing the target caused the officers to suspect at that time that Hardin was in possession of firearms. (FTR 2:14:38-15:15.)

Based on the color photographs which were submitted into evidence at the hearing (doc. no. 47, Exs. 2, 2A, 3, 3A), the area behind Hardin's residence that is not part of the woods is an open area, unobstructed from view when standing at the edge of the woods. There are several outbuildings near the residence, but none of these buildings are situated between the residence and the location where the officers conducted their surveillance.

## II.    DISCUSSION

### A.    The Respective Burdens of the Parties

As a general matter, a defendant contending that a search violated his Fourth Amendment rights must demonstrate that the search was illegal and that he had a legitimate expectation of privacy in the property searched. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). Nevertheless, "[u]pon a motion to suppress evidence garnered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the

4

prosecution." United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983), *cert. denied*, 465 U.S. 1023 (1984); see also United States v. Waldrop, 404 F.3d 365, 368 (5th Cir. 2005) ("A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." (citations omitted)). Thus, "[t]he [g]overnment must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment [sic]." Freire, 701 F.2d at 1519; see also United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[3] Accordingly, although Hardin must demonstrate that the warrantless search of his property implicated his Fourth Amendment rights, once he has done so, the burden shifts to the government to show that an exception to the warrant requirement applies.

### B.      The Officers' August 29, 2011 Surveillance Was Lawful

Defendant argues that the August 29, 2011 surveillance of his residence and property amounted to a warrantless search that violated his reasonable expectation of privacy under the Fourth Amendment. He further argues that the September 19, 2011 Application for Search Warrant and Affidavit were based on fruits of the allegedly unlawful search. Thus, he argues, "all evidence seized as a result of the faulty search warrant, detention, and arrest should therefore be suppressed . . . including all alleged substances seized, scientific evidence developed as a result of the seizure of the alleged controlled substances, and statements

---

[3]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

illegally obtained from the Defendant." (Doc. no. 37, pp. 3-4.) The government asserts that SA Marbert and Investigator Harrison conducted their surveillance while standing in the open fields away from Defendant's residence, and thus even if the officers viewed persons or things within the area near the residence, their vantage point from the open fields rendered the search lawful. (Doc. no. 42, p. 5.) In other words, the government argues that the evidence cited in the Affidavit was not the fruit of an unlawful search, and therefore there is no basis for suppressing evidence seized pursuant to the execution of the search warrant. The government has the better argument.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To contest the legality of a search under the Fourth Amendment, a defendant must demonstrate a legitimate expectation of privacy in the place or item searched by showing a subjective expectation of privacy which society is prepared to recognize as legitimate. Minnesota v. Olson, 495 U.S. 91, 95-96 (1990) (citing Katz v. United States, 389 U.S. 347 (1967)); Smith v. Maryland, 442 U.S. 735, 740 (1979); Rakas v. Illinois, 439 U.S. 128, 143 & n.12 (1978). Moreover, "[t]respass alone does not qualify" as a search; it must be accompanied by "an attempt to find something or obtain information." United States v. Jones, 565 U.S. ___, 132 S. Ct. 945, 951 & n.5 (2012). Hardin has the burden of establishing, under the totality of the circumstances, the contested search violated his legitimate expectation of privacy in a particular place. See Rawlings, 448 U.S. at 104. As explained below, Hardin has not shown that he had a legitimate expectation of privacy in the area in which law enforcement officials stood to conduct their surveillance of his property prior to securing a warrant.

According to the government, law enforcement officials observed a person matching

Hardin's description, as well as a tall marijuana plant growing in an overgrown patch of grass, while they were standing approximately 100 yards from Hardin's residence. Thus, the government argues, the initial discoveries were made in an "open field," an area that may be searched without a warrant. The concept of "open fields" was discussed at length in Oliver v. United States, 466 U.S. 170 (1984), a case where the defendant charged with growing marijuana challenged the warrantless search of his property that led to the discovery of the prohibited plants. Acting on reports that marijuana was being grown on the defendant's farm, narcotics agents drove to the farm, passed the defendant's house, and continued on until they arrived at a locked gate with a sign warning against trespassing. Id. at 173. The agents walked around the gate and eventually found a field of marijuana approximately a mile from the defendant's house. Id. The district court suppressed the evidence, noting that the defendant had posted "no trespassing" signs and erected a locked gate and that the field of marijuana was "bounded on all sides by woods, fences, and embankments and cannot be seen from any point of public access." Id. at 174.

In affirming the court of appeals' decision to overturn the district court's decision, the Supreme Court emphasized that the special protection afforded by the Fourth Amendment to people in their "persons, houses, papers, and effects" does not extend to open fields and that persons cannot legitimately demand privacy for out-door activities conducted in fields. Id. at 176, 178. The Court also explained that its decision did not infringe upon the protection generally afforded to the curtilage of a home, the "area which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" Id. at 180. The Court also stated: "It is clear, however, that the term 'open fields' may include any unoccupied or underdeveloped area outside of the curtilage. An open field need be neither 'open' nor a

'field' as those terms are used in common speech. . . ." Id. at n.11.

The Supreme Court again addressed the issue of "open fields" and curtilage in United States v. Dunn, 480 U.S. 294 (1987). In Dunn, law enforcement agents, acting without a warrant, walked onto the defendant's ranch, crossed several fences, walked up to a barn, looked inside, and saw what they believed to be a drug lab; after two additional visits to the barn, agents described what they had seen in affidavits and secured a search warrant, leading to the seizure of materials used to convict the defendant. Id. at 297-99. In deciding that the actions of the law enforcement officials did not violate the defendant's Fourth Amendment rights, the Court identified four factors pertinent to analyzing curtilage questions:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

Id. at 301. The Court emphasized that these factors are not to be applied mechanically, but rather should serve as useful analytical tools to determine whether an area should be afforded Fourth Amendment protection. Id. The Court concluded that despite crossing over a perimeter fence and "several" interior fences, no constitutional violation had occurred when the officers stopped at the locked front gate of the barn and, standing in the open fields upon which the barn was constructed, peered into the barn to discover the drug lab. Id. at 304.

Moreover, the Court found that even if it were to assume that the barn itself enjoyed Fourth Amendment protection, this did not render the observations into the barn unlawful. Id. at 303-04. In comments particularly germane to the instant case, the Supreme Court stated that

> there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields. Similarly, the fact that the objects observed by the officers lay within an area that we have assumed, but not decided, was protected by the Fourth Amendment does not

8

affect our conclusion.

Id. at 304; see California v. Ciraolo, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."); accord United States v. Williams, 581 U.S. 451, 454 (5th Cir. 1978) (concluding that where law enforcement officers trespassed onto farm property, stood at a point outside the curtilage, and detected the odor of moonshine and fermented mash emanating from a shed within the curtilage, this did not render invalid a subsequently issued search warrant based on this evidence).

Applying the principles of Oliver and Dunn to the case at hand, the Court finds that no constitutional violation occurred when law enforcement officials entered onto Hardin's property and conducted their surveillance on August 29, 2011. The first Dunn factor, proximity to the home, weighs in favor of the government. Law enforcement officers were never closer than roughly 100 yards – or about 300 feet – from Hardin's residence. Although the curtilage of "the farm home" extends beyond the home itself to include "the outer walls" of any outbuildings constituting "the immediate domestic establishment" of the home, United States v. Berrong, 712 F.2d 1370, 1374 (11th Cir. 1983), there were no outbuildings situated between the officers and the residence. Indeed, the fact that SA Marbert used field glasses to make his observations further indicates that the officers were standing at some distance from the "outer walls" of the farm home when they conducted their surveillance.

The second factor, whether the area is included within an enclosure, also weighs in the government's favor. There were no interior fences surrounding the residence. The nearest fence was roughly 100 yards away from the residence, and it was a fallen livestock fence that even in its best days was intended to keep livestock in rather than exclude the public.

9

Although it is unclear the dimensions of this fence, the fact that it encircled such an expansive area around the residence – even aside from the fact that it was no longer functional – suggests that any expectation of privacy within its bounds was not reasonable. See Oliver, 466 U.S. at 179 ("It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas."); see also United States v. Hatch, 931 F.2d 1478, 1481 (11th Cir. 1991) ("Moreover, we have held that 'there is no legitimate expectation of privacy in outbuildings and open fields, *even if fenced*, unless they are part of the curtilage, or immediate appurtenances, of a home.'") (emphasis in original) (citation omitted).

The third factor, the nature of the use to which the area is put, while somewhat less clear, also supports the government's position. The only indication of use in the area where the officers stood to conduct their surveillance was the target for a small shooting range nearby. Aside from the use of the shooting range, SA Marbert testified that there was otherwise no indication that any activity regularly occurred where they were standing, and the field extending out from their location at the edge of the wooded area was overgrown with tall grasses. Although no court appears to have given precise definition to the "intimate activities associated with domestic life and the privacies of the home," Dunn, 480 U.S. at 301 n.4, the Court easily concludes that the use of a shooting range does fall within that class of activities typically thought of as "domestic." Cf. United States v. Vurgess, CR 408-085, doc. no. 29 (S.D. Ga. Sept. 26, 2008) (suppressing evidenced seized from a location where the defendant "kept personal items, bathed, and occasionally slept.")

The fourth factor, steps taken to protect the area from observation, also weighs in favor of the government. Hardin makes much of the fact that his residence was not visible from the highway, had no close neighbors, and was naturally enclosed by woodlands. (Doc. no. 37,

10

p. 6.) However, the relevant inquiry, as enunciated in Dunn, is whether the resident took steps to shield an area from observation "by those standing in the open fields," not simply those standing on public roads or other points of public access. Dunn, 480 U.S. at 302; Oliver, 466 U.S. at 174. Here, there is no indication that there were any fences or other enclosures designed to obstruct the views of persons passing through the open fields around the residence. Thus, taken together, the Dunn factors require a finding that the area where the officers conducted their surveillance was not within the curtilage of the home and was instead in the "open fields." The officers' unobstructed observations from that vantage point were accordingly lawfully made. Id. at 304.

Hardin argues, however, that because the marijuana plant and the person matching his description were located within the curtilage of his residence, he therefore had a reasonable expectation of privacy in that area and any evidence obtained from the August 29th surveillance into that area is therefore tainted as fruit of an unlawful search. (Doc. no. 37, pp. 6-7.) Not so. Even if the Court were to assume that both the marijuana plant and the person matching Hardin's description were within the curtilage of Hardin's residence, this does not shield them from police observation: Dunn makes clear that law enforcement officers standing in the open fields of a defendant's land may lawfully observe persons and objects within an area enjoying Fourth Amendment protection. Dunn, 480 U.S. at 304; see United States v. Hatfield, 333 F.3d 1189, 1198 (10th Cir. 2003) (holding that law enforcement officer who entered onto defendant's land lawfully observed marijuana growing within the curtilage of defendant's backyard where officer stood from a vantage point in an open field); Daughenbaugh v. City of Tiffin, 150 F.3d 594, 601 (6th Cir. 1998) ("[O]fficers may constitutionally view a protected area as long as they make their observations from a lawful

vantage point - i.e., a place located outside the curtilage."). Thus, because SA Marbert and Investigator Harrison conducted their surveillance from outside the curtilage – even assuming that their observations were of persons and things within the curtilage – the surveillance did not violate the Fourth Amendment.

### C.     Probable Cause Properly Established Even Without Information from August 29, 2011 Surveillance

Even if the Court were to assume that the August 29th surveillance of Hardin's residence was unlawful, however, the Court finds that the other information in the Affidavit and Application for Search Warrant was sufficient to support issuance of the warrant. Where some evidence in an affidavit is the product of a Fourth Amendment violation, the warrant remains valid so long as sufficient untainted evidence was present to establish probable cause. United States v. Karo, 468 U.S. 705, 719 (1984); United States v. Free, 254 F. App'x 765, 768 (11th Cir. 2007) (*per curiam*); United States v. Whaley, 779 F.2d 585, 589 n.7 (11th Cir. 1986); cf. United States v. Duran-Orozco, 192 F.3d 1277, 1281 (9th Cir. 1999) (striking portion of a search warrant that was the result of an unjustified warrantless search and then considering whether remaining information was sufficient to support probable cause for issuance of warrant). As noted above, other substantive information in the Affidavit included, *inter alia*, information that SA Marbert and another law enforcement officer received on July 21, 2011 from a reliable SOI that Hardin was growing marijuana around his residence and was in possession of numerous firearms. (Doc. no. 37, Ex. A, p. 8.)

At the hearing, counsel for Hardin argued that the information received from the SOI was too vague and too stale to allow a finding that probable cause existed to issue a warrant. The government argued in response that the Affidavit provided that the SOI was reliable and

explained that the SOI's information was based on observations the SOI had made of Hardin's property. Furthermore, the government argued that although roughly two months had elapsed between the SOI's tip and the submission of the Application for Search Warrant, there was little concern for staleness where the information was related to marijuana growing on Hardin's property because a marijuana plant, by its nature, requires time to grow.

Whenever a search warrant application is presented to a judicial officer, the judicial officer must

> make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit. . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. 213, 238 (1983); see also United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (per curiam) ("Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." (citation omitted)). The Court is mindful, however, that "probable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (quoting Gates, 462 U.S. at 241). Moreover, these probabilities need not come from direct observation but may be inferred from the particular circumstances at issue.[4] United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990).

Furthermore, "probable cause is a fluid concept turning on the assessment of

---

[4]Notably, probable cause may be based on evidence that would not be legally competent in a criminal trial. Draper v. United States, 358 U.S. 307, 311-12 (1959).

probabilities in particular factual contexts[.]" Gates, 462 U.S. at 232. To avoid "rigid" legal rules, Gates changed the "two-pronged test" of Aguilar v. Texas, 378 U.S. 108, 114 (1964) into a totality of the circumstances test. Gates, 462 U.S. at 230-35. Under the Gates totality of the circumstances test, the "veracity" and "basis of knowledge" prongs of Aguilar are not accorded independent status as means for assessing the usefulness of an informant's tips. "[T]hey are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other[.]" Id. at 233. In other words, under the "totality of the circumstances" test, there is no rigid demand that specific tests be satisfied before an informant's tip can be relied on. Id. at 230-31.

Here, upon examination of the totality of the circumstances, the Court concludes that even if the August 29th surveillance of Hardin's property was unlawful, the information from the SOI contained in the Affidavit provided an independent basis for a probable cause to issue the search warrant. First, the Affidavit provided that the SOI had previously provided reliable information regarding drug traffickers in the McDuffie and Wilkes County areas; this information had been used in at least two other cases, one of which resulted in a conviction and one of which was ongoing. (Doc. no. 37, Ex. A, p. 8.)

Second, the basis of the SOI's knowledge was apparent from the Affidavit, which provided that the SOI had visited Hardin's house and property on numerous occasions over the course of several months. (Id.) Throughout this period, the SOI had seen marijuana plants growing on the property and observed several firearms in Hardin's residence. (Id.) Although counsel for Hardin argued that it was unclear how SA Marbert knew the SOI, an affidavit may be based on hearsay information and need not reflect the direct personal observations of the

affiant. Jenkins, 901 F.2d at 1080.

With regard to the alleged "staleness" of the information, "[t]here is no particular rule or time limit for when information becomes stale." United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000) (citing United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) ("When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations[.]"). Rather, courts should make a case-by-case determination, examining the length of time between when the information was obtained and the time when the search warrant was executed, the "nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." Bervaldi, 226 F.3d at 1265 (quoting Harris, 20 F.3d at 450). Moreover, in the Eleventh Circuit, "[w]hen the alleged criminal activity is ongoing . . . it is unlikely that the passage of time will dissipate probable cause." United States v. Hooshmand, 931 F.2d 725, 735 (11th Cir. 1991) (finding that eleven- month-old report from informant was not stale where criminal activities were ongoing) (citing United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985)); see also United States v. Johnson, 290 F. App'x 214, 223 (11th Cir. 2008) (per curiam) (collecting Eleventh Circuit cases rejecting staleness challenges involving information ranging from six months to two years old).

As noted above, the SOI had observed marijuana plants growing around Hardin's residence over a period of several months. Thus, Hardin's alleged criminal activity was ongoing in nature. Moreover, as the government pointed out during the hearing, marijuana plants require time to grow, and therefore the "character of the items sought" was such that they were likely to remain stationary for a long period of time. The passage of roughly two months between the SOI's tip and the Application for Search Warrant does not dissipate

probable cause under these circumstances. See Bervaldi, 226 F.3d at 1265. Thus, considered alone, the information from the reliable SOI with first-hand knowledge of continuing illegal conduct on Hardin's property was sufficient evidence to support a finding of probable cause for the search warrant.

In sum, the Court concludes that no Fourth Amendment violation occurred when law enforcement officials conducted the August 29th surveillance of Hardin's property and observed a marijuana plant and a person matching Hardin's description near the residence. However, even if law enforcement officials should not have conducted the August 29th surveillance, striking the information derived from the surveillance from the Affidavit and Application for Search Warrant does not eliminate probable cause for issuing the warrant. Thus, there is no basis for suppressing the evidence challenged by Hardin.

## III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Hardin's motion to suppress be **DENIED**. (Doc. no. 37.)

SO REPORTED and RECOMMENDED this 26th day of March, 2012, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE